FILED
2015 MAY 4 AM 10:12
CLERK
U.S. DISTRICT
COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ILIAD RESEARCH AND TRADING, L.P., a Delaware limited partnership,<br><br>Plaintiff,<br><br>v.<br><br>ADVAXIS, INC., a Delaware Corporation,<br><br>Defendant. | **MEMORANDUM OPINION AND ORDER**<br><br><br><br>Case No. 2:14-CV-00478-BSJ<br><br>District Judge Bruce S. Jenkins |

Plaintiff's Motion for Partial Summary Judgment,[1] Defendant's Motion to Deny Motion for Partial Summary Judgment and for Discovery,[2] and Plaintiff's Motion to Strike[3] came before the court for hearing on March 11, 2015. Jeremy C. Reutzel and Brig Harman appeared on behalf of Plaintiff. Frederick R. Kessler and Jack Nelson appeared on behalf of Defendant.[4]

After hearing arguments from counsel, the court granted Plaintiff's Motion to Strike and reserved ruling on the remaining two motions.[5]

Having considered the parties' briefs, the arguments of counsel, and the relevant law, the court GRANTS Plaintiff's Motion for Partial Summary Judgment and DENIES Defendant's competing motion for denial and discovery.

---

[1] Mot. for Partial Summ. J., filed Sept. 22, 2014, (CM/ECF No. 22).

[2] Def.'s Mot. to Den. Pl.'s Mot. for Partial Summ. J. and for Allowance of Disc. Pursuant to Rule 56(D) and Mem. in Supp., filed Dec. 5, 2014 (CM/ECF No. 43).

[3] Mot. to Strike Jury Demand and Supporting Mem. of P. & A., filed Mar. 2, 2015 (CM/ECF No. 62).

[4] Mar. 11, 2015 Minute Entry, (CM/ECF No. 65).

[5] *Id.*; Order Granting Mot. to Strike Jury Demand, filed Mar. 23, 2015 (CM/ECF No. 68).

## I. DISCUSSION

The following facts are not genuinely disputed:

- Advaxis and Tonaquint entered into the Purchase Agreement on December 13, 2012.[6]

- On November 19, 2012, prior to entering into the Purchase Agreement, Thomas Moore, Advaxis' Chief Executive Officer and Chairman, emailed Tonaquint indicating that Advaxis desired to enter into a 3(a)(10) transaction.[7]

- John Fife—Tonaquint's CEO—responded via email that Tonaquint would like a right of first refusal with respect to any 3(a)(10) transaction.[8]

- As negotiations continued, Advaxis negotiated the right of first refusal into a right to participate as set forth in the Purchase Agreement.[9]

- The Purchase Agreement, at §5.2(k) states as follows:

  > Section 3(a)(9) and 3(a)(10) Right of Participation.
  > Pursuant to the terms of this subsection, [Advaxis] hereby grants [Tonaquint] a right of participation with respect to any transaction or arrangement structured, in whole or in part, in accordance with Section 3(a)(9) or Section 3(a)(10) of the 1933 Act . . . that [Advaxis] proposes to enter into any time during the period beginning on the date hereof and ending on the later of (i) two (2) years after the date hereof and (ii) the date that all of [Advaxis'] obligations hereunder and the Note are paid and performed in full and the Warrant is exercised in full (or otherwise expired) . . . *provided, however,* that [Tonaquint] may only elect to participate in acquiring up to 50% of the principal balance of such Section 3(a)(9) or 3(a)(10) Transaction. [Advaxis]

---

[6]Mem. in Opp'n to Mot. for Partial Summ. J., filed Dec. 5, 2014, (CM/ECF No. 39) [hereinafter Opposition], at xxiv.

[7]*Id.*, at xxxiii.

[8]*Id.*, at xxxiv.

[9]*Id.*

shall give written notice of any such proposed section 3(a)(9) or 3(a)(10) Transaction to [Tonaquint] . . . which Section 3(a)(9) or 3(a)(10) Notice shall identify the proposed parties and the terms of the proposed Section 3(a)(9) or 3(a)(10) Transaction.[10]

- Still in §5.2, the Purchase Agreement further states "[f]or the avoidance of any doubt, the requirements of this Section 5.2 are material to this Agreement and any violation or breach thereof by the Company shall constitute a default under this Agreement."[11]

- The Purchase Agreement[12] also contains the following provisions:

  o 12. SPECIFIC PERFORMANCE. [Advaxis] and [Tonaquint] acknowledge and agree that irreparable damage would occur in the event that any provision of this Agreement or any of the other Transaction Documents were not performed in accordance with its specific terms or were otherwise breached . . .

  o 15.7 Entire Agreement. This Agreement, together with the other Transaction Documents, constitutes and contains the entire agreement and understanding between the parties hereto, and supersedes all prior oral or written agreements and understandings between [Tonaquint], [Advaxis], their Affiliates and Persons acting on their behalf with respect to the matters discussed herein and therein, and, except as specifically set forth herein or therein, neither [Advaxis] nor [Tonaquint] makes any representation, warranty, covenant or undertaking with respect to such matters.

  o 15.8 Amendment. Any amendment, supplement or modification of or to any provision of this Agreement, shall be effective only if it is made

---

[10]*Id.*, at xxviii-xxix; Purchase Agreement, (CM/ECF No. 22-2), at § 5.2(k).

[11](CM/ECF No. 22-2), at §5.2.

[12](CM/ECF No. 22-2).

3

or given by an instrument in writing (excluding any email message) and signed by [Advaxis] and [Tonaquint].

o  15.9 No Waiver. No forbearance, failure or delay on the part of a party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver of any provision of this Agreement shall be effective (a) only if it is made or given in writing (including an email message) and (b) only in the specific instance and for the specific purpose for which made or given.

o  15.13 No Strict Construction. The language used in this Agreement is the language chosen mutually by the parties hereto and no doctrine of construction shall be applied for or against any party.

- On December 14, 2012, one day after Advaxis and Tonaquint entered into the Purchase Agreement, Ironridge Global IV, Ltd. ("Ironridge") purchased a $611,196.29 debt claim against Advaxis.[13]

- On December 19, 2012, Advaxis and Ironridge entered into a Stipulation for Settlement of Claims that sought to settle Ironridge's claim against Advaxis through a Section 3(a)(10) transaction.[14]

- On December 20, 2012, the Superior Court of the State of California for the County of Los Angeles – Central District entered an order for approval of the Stipulation for Settlement of Claims.[15]

---

[13] See Advaxis Form 8-K dated 12-28-2012, (CM/ECF No. 22-7).

[14] Id.

[15] Id.

- Tonaquint did not participate in the Advaxis-Ironridge Section 3(a)(10) transaction.[16]

- Tonaquint later assigned to Iliad all of Tonaquint's right, title, and interest in, to and arising under the Purchase Agreement.[17] Advaxis consented to such assignment.[18]

Whether Advaxis breached the Purchase Agreement when it entered into the Section 3(a)(10) transaction with Ironridge requires analysis of three questions: (i) was Tonaquint entitled to participate in the Section 3(a)(10) transaction with Ironridge; (ii) if so, did Advaxis provide sufficient notice of the Section 3(a)(10) transaction with Ironridge; and (iii) did Tonaquint (and Iliad) waive any material breach to the Purchase Agreement?

The court will analyze these three questions in turn.

## *1. Was Tonaquint Entitled to Participate in the Section 3(a)(10) Transaction with Ironridge?*

The Purchase Agreement says what it says. And with regards to the Section 3(a)(10) Participation Right, as outlined above, the Purchase Agreement says the following:

> Section 3(a)(9) and 3(a)(10) Right of Participation. Pursuant to the terms of this subsection, [Advaxis] hereby grants [Tonaquint] a right of participation with respect to any transaction or arrangement structured, in whole or in part, in accordance with Section 3(a)(9) or Section 3(a)(10) of the 1933 Act . . . that [Advaxis] proposes to enter into any time during the period beginning on the date hereof and ending on the later of (i) two (2) years after the date hereof and (ii) the date that all of [Advaxis'] obligations hereunder and the Note are paid and performed in full and the Warrant is exercised in full (or otherwise expired) . . . *provided, however,* that [Tonaquint] may only elect to participate in acquiring up to 50% of the principal balance of such Section 3(a)(9) or 3(a)(10) Transaction.

(CM/ECF No. 22-2), at §5.2(k).

---

[16]Hr'g 3/11/15 Tr., (CM/ECF No. 66) at 31:11-22.

[17]Assignment and Assumption Agreement, (CM/ECF No. 22-3).

[18]Opposition, *supra* note 6, at xxviii; Hr'g 3/11/15 Tr., (CM/ECF No. 66), at 38:5-7.

Advaxis seeks to stand in two places at once regarding this contract provision and whether it is ambiguous or unambiguous. In its opposition to the summary judgment motion, Advaxis argues the meaning of the Participation Right provision is unambiguous:

> Iliad's interpretation is contrary to the plain language of the purchase agreement's Participation Right. The Participation Right only permitted Tonaquint to participate in Section 3(a)(9) or Section 3(a)(10) transactions "that [Advaxis] proposes to enter into any time during the period beginning on the date hereof . . ." Thus, the Purchase Agreement gives a Participation Right only in transactions that Advaxis "proposed" to enter into *after* the Purchase Agreement was executed. This interpretation comports with the plain meaning of the word "proposes."

(CM/ECF No. 39), at 5 (internal citations omitted). But at the March 11, 2015 hearing, Advaxis' position was more opaque:

| | |
|---|---|
| THE COURT: | Well, let's return to my earlier question. Is the contract ambiguous? |
| MR. KESSLER: | So our position is it's not ambiguous because it reads clearly in our way. But on this motion we don't have the burden of proof. |
| THE COURT: | Why do we need testimony at all? |
| MR. KESSLER: | Because it's been disputed. Our witnesses have sworn, two witnesses have sworn -- |
| THE COURT: | There's a distinction between what occurred, what occurred, and what a contract says. |
| MR. KESSLER: | Yeah. And they've sworn this is what I understand, not what occurred. |
| THE COURT: | No. Their understanding doesn't make a bit of difference, does it? Aren't we looking at the document? |
| MR. KESSLER: | If -- if -- if -- if you think that the question is ambiguous, then their understanding does matter. |

THE COURT:      Well, no, no. What I think as to what it is or is not ambiguous I don't know is helpful. My question to you was is this ambiguous, and you said no, Judge, this is not ambiguous.

MR. KESSLER:    I said our position is it's not ambiguous because it reads our way. That was my response, Judge. It wasn't that it was unambiguous and reads their way, no.

THE COURT:      I'll ask you is it ambiguous or isn't it?

MR. KESSLER:    All right. If you want me to pick, I'm going to say it's ambiguous and we'll have a trial.

THE COURT:      I just want your position.

MR. KESSLER:    It's ambiguous.

THE COURT:      And if ambiguous, what's the process for clearing up the ambiguity?

MR. KESSLER:    The process is discovery and trial.

THE COURT:      Oh, but what are you discovering?

MR. KESSLER:    We're going to get to talk to the drafters of the document to understand their intent, both the intent and understanding of the language and the intent of the meaning. As you know, Judge, better than I do, in this court there's an analysis of facial ambiguity and there's an analysis whether there's ambiguity of the intent of the parties overall, and I think in this context both apply.

. . .

THE COURT:      And as I understand your position, you suggest that construing the contract is a factual adventure rather than a legal adventure?

7

MR. KESSLER:    I think in the first instance the Court construes it as a matter of law and - - but in my mind it presents a factual question and so then it's open for parol evidence.

Hr'g 3/11/15 Tr., at 27:4-28:19; 47:16-22.

Iliad, both in its partial summary judgment motion and at the March 11, 2015 hearing, argued that the Purchase Agreement, including the Participation Right, is unambiguous. Iliad argues the Purchase Agreement obligates Advaxis to give Tonaquint written notice and a right to participate in 3(a)(10) transactions, like the Ironridge transaction, that Advaxis proposes to enter into after execution of the Purchase Agreement.[19]

Contract interpretation is a question of law.[20] The court looks to the language of the contract to determine its meaning and the intent of the contracting parties.[21] A contract is ambiguous if it is capable of more than one reasonable interpretation due to uncertain terms, missing terms, or other facial problems.[22] If the language of the contract at issue—the Purchase Agreement, specifically the Participation Right—is ambiguous, then a genuine dispute of material fact exists and summary judgment is inappropriate.[23]

The key question is the meaning of the phrase "that [Advaxis] proposes to enter into any time during the period beginning on the date hereof . . ."[24] The court finds Advaxis' position—that the phrase excludes transactions Advaxis *proposed* prior to signing the Purchase Agreement—is not reasonably supported by the language of the contract.

---

[19]*See* Mot. for Partial Summ. J., filed Sept. 22, 2014, (CM/ECF No. 22); Hr'g 3/11/15 Tr., at 6:9-7:2.

[20]*See Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 13, 266 P.3d 671, 676.

[21]*See Cafe Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235, 1240.

[22]*Id.* (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 20, 54 P.3d 1139).

[23]*See Ultra Clean Holdings, Inc. v. TFG-California, L.P.*, 534 F. App'x 776, 784 (10th Cir. 2013).

[24]Purchase Agreement, (CM/ECF No. 22-2), at § 5.2(k).

Advaxis' interpretation could be reasonable *if* the Participation Right referred to 3(a)(10) transactions "that Advaxis proposes during the period beginning on the date hereof." But that is not what the Purchase Agreement says. Instead (and importantly), the word "proposes" is followed by the phrase "to enter into." The Advaxis interpretation would render meaningless the words "to enter into." And as Advaxis notes, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."[25]

After giving full meaning to "proposes to enter into" in its entirety, the interpretation is plain: the Participation Right covers 3(a)(10) transactions that Advaxis seeks to consummate after the Purchase Agreement is executed. This interpretation—the same one Iliad suggests—renders no word superfluous, including the word "proposes." As argued by Iliad, "proposes" describes the transaction's status: unconsummated, planned, intended.[26] Indeed, if the 3(a)(10) transaction were not still unconsummated (i.e., merely in the proposed stage) when it fell under the terms of the Purchase Agreement, the Participation Right would be unavailing—there would be nothing left to participate in. Clearly, not every contemplated or negotiated Section 3(a)(10) transaction comes to fruition. But, under the Purchase Agreement, if Advaxis were to try—were to *propose*—to enter into a 3(a)(10) transaction after execution of the Purchase Agreement, Advaxis needed to let Tonaquint know and give Tonaquint an opportunity to participate.

This determination is supported by consideration of the relevant evidence. And according to the Utah Supreme Court, consideration of such evidence is appropriate:

> "When determining whether a contract is ambiguous, any relevant evidence must be considered" and "the better-reasoned approach is

---

[25]Opposition, *supra* note 6, at 6, citing *McNeil Eng'g and Land Surveying, LLC v. Bennett*, 268 P.3d 854, 859 (Utah Ct. App. 2011), which in turn quotes Restatement (2d) of Contracts § 203(a) (1981).

[26]Mot. for Partial Summ. J., filed Sept. 22, 2014, (CM/ECF No. 22), at 1.

to consider the writing in light of the surrounding circumstances." *Ward v. Intermountain Farmers Ass'n,* 907 P.2d 264, 268 (Utah 1995). We allow the introduction of relevant evidence regarding the existence of a potential ambiguity to prevent an "inherently one-sided [analysis] ... based solely on the extrinsic evidence of the judge's own linguistic education and experience." *Id.* (internal quotation marks omitted). In this way, we can interpret a contract and any potential ambiguity in light of the parties' intentions. *See WebBank v. Am. Gen. Annuity Serv. Corp.,* 2002 UT 88, ¶ 17, 54 P.3d 1139 ("The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract.").

*Watkins v. Ford*, 2013 UT 31, ¶ 26, 304 P.3d 841, 847, as amended (Aug. 6, 2013).

The relevant evidence includes the following facts. On November 5, 2012 Advaxis and Tonaquint entered into a term sheet for a convertible note transaction.[27] On November 15, 2012, Advaxis and Ironridge entered into a term sheet proposing a transaction to satisfy creditor liabilities of Advaxis.[28] On November 19, 2012, prior to entering into the Purchase Agreement, Thomas Moore, Advaxis' Chief Executive Officer and Chairman, emailed Tonaquint indicating that Advaxis desired to enter into a 3(a)(10) transaction. The email states as follows:

> Coby,
>
> Thanks so much for the docs! Mark and I appreciate that we are rushing you. So its not surprising that some things need to be made consistent with the term sheet. Here is what we noticed:
>
> The reduction in the conversion price begins 6 months after closing, not right away.
> The default is in event of a judgment of $1,000,000 or more, not $100,000.
> The note is for $880,000, not $890,000.
> No registration rights were in the term sheet. We always looked at this as a 144 agreement.
>
> Other points we would like to discuss are:
> We would like to do a 3(a)10. Is this permitted under the agreement?
> We have done a quarterly restatement, not an annual. Can we exempt this?
> Can we either eliminate the cross default or get 30 days to cure.
> Can we extend any default notice to 4 days instead of overnight?

---

[27]Term Sheet $880,000 Convertible Note, (CM/ECF No. 40-1).

[28]Term Sheet for Satisfaction of Up to $1.55 Million in Creditor Liabilities, (CM/ECF No. 40-2).

Thanks!

Tom and Mark
Advaxis, Inc.

(CM/ECF No. 22-4).

In response, John Fife, Tonaquint's CEO, sent the following email:

> The reduction in the conversion price begins 6 months after closing, not right away.
> JF -- I agree with Tom's statement.
>
> The default is in event of a judgment of $1,000,000 or more, not $100,000.
> JF -- I agree with Tom's statement.
>
> The note is for $880,000, not $890,000.
> JF -- The term sheet had $15K for legal.  $5K was paid in cash already. $10K is being added to the note.
>
> No registration rights were in the term sheet. We always looked at this as a 144 agreement.
> JF- I agree with Tom's statement
>
> Other points we would like to discuss are:
> We would like to do a 3(a)10. Is this permitted under the agreement?
> Yes -- However we would like a FROR with respect to these opportunities. We are familiar with and experienced in these type of transactions.
>
> We have done a quarterly restatement, not an annual. Can we exempt this?
> JF -- I am OK with this provided there is not impact on our right to 6 month 144 sales.
>
> Can we either eliminate the cross default or get 30 days to cure.
> JF -- Let's talk about this point.
>
> Can we extend any default notice to 4 days instead of overnight?
> JF -- Probably,  Let me talk to counsel.

(CM/ECF No. 22-5).

Thereafter, on November 28, 2012, Tonaquint emailed Advaxis a redline of a new draft Purchase Agreement, adding a new Section 5.2(k) with a right of first refusal regarding Section 3(a)(9) and 3(a)(10) transactions.[29] On November 29, 2012, Advaxis Chief Financial Officer

---

[29](CM/ECF No. 40-5).

Mark Rosenblum emailed Tonaquint stating, in part, that a right of first refusal will not work for Advaxis "as the company has already made several 3 A 9 commitments."[30] John Fife responded by inquiring, "Please advise as the [sic] what 3(a)9 commitments the company has made."[31] Advaxis has not identified or provided the court with an email responding to John Fife's inquiry as to "what 3(a)9 commitments the company has made."[32]

On December 3, 2012, Tonaquint's counsel emailed Advaxis a redlined revised draft Purchase Agreement with a right to participate in 50% of Section 3(a)(9) and Section 3(a)(10) transaction instead of a right of first refusal.[33]

In the Thomas Moore affidavit offered by Advaxis,[34] Moore states that his November 19, 2012 email—wherein he says, "We would like to do a 3(a)(10). Is this permitted under the agreement?"—refers to the transaction with Ironridge.[35] Moore states regarding the "proposes to enter into" language that he "understood that it excluded proposals made before Advaxis had consummated an agreement with Tonaquint, such as the Ironridge Transaction, in part because it would not have been fair for Tonaquint to benefit from Advaxis' activity before Tonaquint had entered into a contractual agreement with Advaxis."[36] Moore further states that he understood

---

[30](CM/ECF No. 40-6).

[31]*Id.*

[32]*See* Opposition, *supra* note 6, at xiv; Aff. of Thomas A. Moore in Opp'n to Mot. for Partial Summ. J., filed Dec. 5, 2014, (CM/ECF No. 40), at 3.

[33](CM/ECF No. 40-7).

[34]Note: Advaxis also provided affidavits from Daniel J. O'Connor (CM/ECF No. 41) and Mark J. Rosenblum (CM/ECF No. 42). Because these affidavits do not provide, for the purposes of the present analysis, additional information materially different from the Moore affidavit, the court does not discuss these affidavits further.

[35]Aff. of Thomas A. Moore in Opp'n to Mot. for Partial Summ. J., filed Dec. 5, 2014, (CM/ECF No. 40) at 2.

[36]*Id.*, at 3.

Mark Rosenblum's email—wherein Rosenblum stated that a right of first refusal will not work

for Advaxis "as the company has already made several 3 A 9 commitments"—to refer to the

Ironridge Transaction.[37]

      Additionally, Moore's affidavit states the following:

> During negotiation of the Purchase Agreement, I (on behalf of Advaxis) orally told Tonaquint (through its leader Fife) that Advaxis had previously proposed a 3(a)(10) transaction with Ironridge and that such Ironridge Transaction was, thus, not included within the Purchase Agreement's Participation Right. Tonaquint (through Fife) acknowledged this fact, but requested that Tonaquint be permitted to participate in the Ironridge Transaction anyway. I declined the request, and informed Fife that Advaxis would proceed with the Ironridge Transaction without Tonaquint. In response, Fife expressed hope that Advaxis might do a future 3(a)(10) transaction with Tonaquint.

(CM/ECF No. 40), at 4-5.[38]

      Such extrinsic evidence does not warrant a finding of contract ambiguity. This is true for

two reasons. First, the extrinsic evidence suggests the Participation Right includes the Ironridge

transaction. The evidence shows that when Advaxis sent Iliad an email indicating they would

like to do a 3(a)(10) transaction—which email, Advaxis argues, referred to the Ironridge

transaction—Iliad responded by asking for a right of first refusal. Iliad sent Advaxis a draft

Purchase Agreement that included a right of first refusal, using the same "proposes to enter into"

language found in the final Purchase Agreement. Notably, Advaxis responded by saying that a

right of first refusal "will not work as the company has already made several 3 A 9

commitments." As Iliad points out,[39] if transactions proposed prior to Purchase Agreement were

---

[37]*Id.*

[38]The court notes that Iliad, through a declaration by John Fife included in Iliad's reply memorandum, asserts that such conversation never happened and is a fabrication by Mr. Moore. *See* Decl. of John M. Fife in in [sic] Reply to Advaxis, Inc.'s Opp'n to Mot. for Partial Summ. J., filed Jan. 23, 2015, (CM/ECF No. 57) at 47 of 94.

[39]*See Reply Mem. in Supp. of Mot. for Partial Summ. J.,* filed Jan. 23, 2015, (CM/ECF No. 57) at 5.

not included in the Participation Right under the "proposes to enter into" language, then there would be no conflict between a right of first refusal and Advaxis' pre-existing Section 3(a)(9) commitments, because the right of first refusal would not be applicable to those previously proposed transactions.

Second, even if the court's review of extrinsic evidence only included the Moore affidavit, wherein Moore stated he orally informed Iliad's CEO that the Purchase Agreement did not include the Ironridge transaction, the extrinsic evidence would still not warrant a finding of contract ambiguity. The Utah Supreme Court has clearly stated that the introduction of relevant extrinsic evidence does not allow parties to create ambiguity or to "advocate for an interpretation that is in no way supported by the language of the underlying contract."[40] The Utah Supreme Court[41] has stated that "there can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms."[42] "In other words, our statement that '[r]ational interpretation requires at least a preliminary consideration of all credible evidence,' . . . does not create a preference for that evidence over the language of the contract . . . [A] finding of ambiguity after a review of relevant, extrinsic evidence is appropriate only when 'reasonably supported by the language of the contract.'"[43] According to the Utah Supreme Court, "a finding of ambiguity will prove to be the exception and not the rule."[44] In the present case, any

---

[40]*See Watkins v. Ford*, 2013 UT 31, ¶ 26, 304 P.3d 841, 847 n.2, as amended (Aug. 6, 2013).

[41]About a week after the March 11, 2015 hearing on Plaintiff's partial summary judgment motion, the Utah Court of Appeals issued a decision reiterating Utah law and the Utah Supreme Court's position on extrinsic evidence and a finding of ambiguity. *See Anderson v. Dep't of Corr.*, 2015 UT App 63 (not released for publication as of the date of this opinion).

[42]*Daines v. Vincent*, 2008 UT 51, ¶ 31, 190 P.3d 1269, 1277 (citing *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428).

[43]*Id.*, at 2008 UT 51, ¶ 27, 190 P.3d 1269, 1276 (quoting *Ward v. Intermountain Famers Ass'n*, 907 P.2d 264, 268 (Utah 1995)).

[44]*Id.*, at 2008 UT 51, ¶ 30, 190 P.3d 1269, 1277 n.5.

14

interpretation other than one that deems the Ironridge transaction as falling within the Participation Right is incongruent with the plain contractual terms.[45] As stated previously, the Purchase Agreement says what it says, and it says Tonaquint had a right to participate in the Ironridge transaction.

Having determined that there is only one reasonable interpretation supported by the language of the Purchase Agreement, the court finds the contract unambiguously provided Tonaquint a right to participate in Advaxis' Section 3(a)(10) transaction with Ironridge.

## 2. Did Advaxis Provide Sufficient Notice of the Section 3(a)(10) Transaction with Ironridge?

Having determined that the Section 3(a)(10) Ironridge transaction falls within the purview of the Purchase Agreement, the court must next determine whether Advaxis breached that agreement. Again, the court turns to the plain contract language itself:

> [Advaxis] shall give written notice of any such proposed section 3(a)(9) or 3(a)(10) Transaction to [Tonaquint] . . . which Section 3(a)(9) or 3(a)(10) Notice shall identify the proposed parties and the terms of the proposed Section 3(a)(9) or 3(a)(10) Transaction.

Purchase Agreement, (CM/ECF No. 22-2), at § 5.2(k). By its plain terms, the Purchase Agreement requires Advaxis to provide written notice prior to the consummation of any proposed Section 3(a)(10) transaction.

Advaxis argues it did not materially breach this contractual notice requirement because it provided Tonaquint with prior email and oral notice of the Ironridge transaction.[46] First, Advaxis

---

[45]Indeed, Advaxis' interpretation is especially unreasonable when one considers what is clearly absent from the Purchase Agreement: any discussion of what constitutes a pre-contract § 3(a)(10) proposal. The Purchase Agreement is silent on when a pre-contract § 3(a)(10) proposal must be made, who the proposal must be made to, and what terms must be included in the proposal. The Purchase Agreement is silent on these questions because, under the contract's plain terms, such a discussion is irrelevant. The relevant inquiry is not when Advaxis first contemplates entering into a § 3(a)(10) transaction, but when Advaxis contemplates consummating such a transaction. And here the Purchase Agreement provides unambiguous direction: if the contemplated § 3(a)(10) transaction is to be consummated after the Purchase Agreement is executed, Advaxis must notify Tonaquint.

15

contends its November 19, 2012 email to Tonaquint stating that Advaxis "would like to do a 3(a)(10) transaction," constitutes notice.[47] But even if the court accepted that the November 19, 2012 constituted notice, which the court does not,[48] such email in no way complies with the other notice requirements, namely that the notice "identify the proposed parties and the terms of the proposed Section 3(a)(9) or 3(a)(10) Transaction." The November 19, 2012 email fails to identify the payments terms, the debt involved in the 3(a)(10) transaction, or the proposed date of consummation. The insufficiency of such "notice" is made clear by Tonaquint's subsequent email asking Advaxis to "[p]lease advise as [to] what 3(a)9 commitments the company has made;"[49] which inquiry Advaxis apparently did not respond to.[50]

Second, Advaxis argues it did not materially breach the Purchase Agreement's notice requirement because it provided Tonaquint with prior oral notice of the Ironridge transaction.[51] Referring to the Moore affidavit,[52] Advaxis argues that "during negotiation of the Purchase Agreement, Advaxis (through its then CEO Moore) orally told representatives of Tonaquint (through its leader Fife) that Advaxis had previously proposed a 3(a)(10) transaction with

---

[46] *See* Opposition, *supra* note 6, at 16-17; Hr'g March 11, 2015 Tr., (CM/ECF No. 66) at 32:18-22.

[47] Opposition, *supra* note 6, at 16.

[48] The court agrees with Iliad that the November 19, 2012 does not constitute notice. That email was the catalyst for the resulting rights to notice and participation in Section 3(a)(10) transactions. The email cannot simultaneously be the impetus of a negotiation and additionally the satisfaction of the resulting negotiated agreement. The November 19, 2012 email was sent before the Purchase Agreement was entered into and cannot satisfy a contract requirement before the requirement even existed. *See Reply Mem. in Supp. of Mot. for Partial Summ. J.,* filed Jan. 23, 2015, (CM/ECF No. 57) at 8-9.

[49] (CM/ECF No. 40-6).

[50] *See* Opposition, *supra* note 6, at xiv; Aff. of Thomas A. Moore in Opp'n to Mot. for Partial Summ. J., filed Dec. 5, 2014, (CM/ECF No. 40), at 3.

[51] *See* Opposition, *supra* note 6, at 16-17.

[52] Aff. of Thomas A. Moore in Opp'n to Mot. for Partial Summ. J., filed Dec. 5, 2014, (CM/ECF No. 40).

Ironridge and that such Ironridge Transaction was, thus, not included within the Purchase

Agreement's Participation Right."[53]

Assuming this conversation occurred, it still does not satisfy the notice obligations

Advaxis undertook in the Purchase Agreement. In this purported conversation, Moore informed

Fife that the Ironridge transaction was *not* included in the Purchase Agreement. It is difficult to

argue that an oral conversation, wherein Advaxis tells Tonaquint they are not entitled to

participate in the Ironridge transaction, constitutes notice of a 3(a)(10) transaction that Tonaquint

is, in fact, entitled to participate in. This alleged oral conversation is, at best, unclear.[54]

Additionally, it is incomplete; the Moore affidavit gives no indication that Moore disclosed to

Tonaquint the terms of the proposed 3(a)(10) transaction, as required under the Purchase

Agreement.

Furthermore, such oral communications do not satisfy the Purchase Agreement's

requirement of *written* notice. Advaxis argues that the failure to provide written notice is

immaterial and excused by Advaxis' substantial performance.[55] The court disagrees.

Under Utah law, where performance varies as to "mere technical, inadvertent, or

unimportant omissions or defects," the doctrine of substantial performance may excuse

omissions.[56] However, "substantial performance is an equitable doctrine which should be

---

[53]Opposition, *supra* note 6, at xxv.

[54]The lack of clarity surrounding this purported oral conversation demonstrates why the parties may have ultimately agreed that notice of Section 3(a)(10) transactions would be provided in written form. *See TFG-Illinois, L.P. v. United Maint. Co.*, 829 F. Supp. 2d 1097, 1114 (D. Utah 2011) (wherein the court describes the notice provided as confusing "and the uncertainty it creates speaks to why [Plaintiff] may have bargained for a formal notice process in the first place.").

[55]*See* Opposition, *supra* note 6, at 17. The court notes that Advaxis cites *Monus v. Colorado Baseball 1993, Inc.*, 1996 U.S. App. LEXIS 32995 (10th Cir. Colo. Dec. 17, 1996) in support of its position, but as this case expressly applies Colorado law, it is not relevant here and the court will not discuss it further.

[56]*See Cent. Utah Water Conservancy Dist. v. Upper E. Union Irr. Co.*, 2013 UT 67, 321 P.3d 1113, 1120 (quoting 15 WILLISTON ON CONTRACTS, § 44:52 (4th ed.)).

sparingly employed as it defeats the bargained-for legal rights of the parties."[57] In the present case, Advaxis does not qualify for the substantial performance doctrine. First, the Purchase Agreement expressly states the following: "For the avoidance of any doubt, the requirements of this Section 5.2 are material to this Agreement and any violation or breach thereof by [Advaxis] shall constitute a default under this Agreement."[58] This language, which the parties agreed to, anticipates that the promises undertaken in Section 5.2, including those regarding written notice of Section 3(a)(10) transactions, will not be taken as merely technical, unimportant details. Allowing Advaxis to invoke substantial performance deprives Tonaquint (and, by implication, Iliad) of a benefit which Tonaquint reasonably expected.[59] Second, Advaxis' noncompliance is not limited to a failure to provide *written* notice. Under the Purchase Agreement, Advaxis was to provide notice of Section 3(a)(10) transactions, complete with their terms, that Tonaquint *was* entitled to participate in. Instead, Advaxis notified Tonaquint of a Section 3(a)(10) transaction that, according to Advaxis, Tonaquint was *not* entitled to participate in. And there is no evidence that such oral communication included the terms of the Ironridge transaction. Given Advaxis' minimal compliance with its obligations to Tonaquint under the Participation Right, the court cannot find Advaxis qualifies for an equitable doctrine which, under Utah law, is to be "sparingly employed."[60]

---

[57] *Cache Cnty. v. Beus*, 1999 UT App 134, ¶ 40, 978 P.2d 1043, 1050; *see also TFG-Illinois, L.P. v. United Maint. Co.*, 829 F. Supp. 2d 1097, 1114 (D. Utah 2011).

[58] Purchase Agreement, (CM/ECF No. 22-2), at 20.

[59] *See Restatement (Second) of Contracts* § 241 (1981). While the court does not expressly discuss each of the factors identified in the Restatement that "can assist a court in determining the 'materiality' of a breach," (*see Cache Cnty. v. Beus*, 1999 UT App 134, ¶ 37, 978 P.2d 1043, 1050), the court notes that consideration of these factors supports its finding that Advaxis has not substantially performed its obligations under the Participation Right.

[60] Advaxis also argues that the Purchase Agreement itself demonstrates that the parties understood notice was not material to the agreement. *See* Opposition, *supra* note 6, at 17, n.15. They note that although § 5.2 of the Purchase Agreement requires Advaxis to provide Tonaquint with copies of certain governmental filings, it expressly excludes from that duty any obligation to provide Tonaquint with copies of publicly-available filings. Thus, Advaxis

18

Throughout Advaxis' written opposition to summary judgment, as well as during the March 11, 2015 hearing, Advaxis argues Tonaquint received constructive notice of the Ironridge transaction through Advaxis' and Ironridge's filings with the SEC.[61] On December 21, 2012, Ironridge filed a Form 13G,[62] and on December 28, 2012, Advaxis filed a Form 8-K.[63] Both of these filings, Advaxis argues, publicly disclosed the Ironridge transaction. Iliad concedes Tonaquint discovered the Ironridge transaction disclosed in Advaxis' December 28, 2012 Form 8-K, but argues Tonaquint did not make such discovery until February 2013.[64] However, if and when these SEC filings provided constructive notice of the Ironridge transaction are moot points. Even if Tonaquint discovered the Ironridge transaction on the date of these filings—December 21 or 28, 2012—the critical fact is that both dates are still *subsequent* to consummation of the Purchase Agreement and *subsequent* to consummation of the Ironridge transaction. By December 21, 2012, notice—constructive or otherwise—of the Ironridge transaction is no longer helpful. The entire purpose of the Participation Right and its notice requirements is to give

---

argues, the Purchase Agreement allows constructive notice in the form of SEC filings to satisfy notice requirements. This argument is a misrepresentation of the Purchase Agreement. Advaxis seems to treat the provisions regarding government filings as umbrella terms that control or affect the Participation Right obligations, but this is unsupported by the Purchase Agreement. It is in § 5.2(a), an entirely different section than §5.2(k), that the Purchase Agreement discusses Advaxis' obligations to comply with federal, state, and local rules and regulations, including filing requirements under United States securities laws. Under § 5.2(a), and expressly with regards to these government filings, Advaxis must provide Tonaquint a copy of any such filings, "unless such filings are publicly available on the SEC's EDGAR system." The Purchase Agreement gives no indication that the obligations to provide copies of government filings, or the exceptions thereto, contained under § 5.2(a) in any way relate to provisions under § 5.2(k). And § 5.2(a) certainly gives no indication that the Participation Right notice requirements under § 5.2(k) are immaterial. If anything, they support the materiality of § 5.2(k) notice requirements. While clearly capable of negotiating and drafting exceptions to obligations for written materials in one context (e.g., § 5.2(a)), the parties chose not to do so when negotiating and drafting the requirement for written notice under § 5.2(k), suggesting that there is no satisfactory substitute to written notice under § 5.2(k).

[61]Opposition, *supra* note 6, at xviii-xix, xxvi-xxvii, 7, 14, 20; Hr'g March 11, 2015 Tr., (CM/ECF No. 66) at 34:22-25.

[62](CM/ECF No. 40-13).

[63](CM/ECF No. 40-14).

[64]Second Am. Compl., filed Aug. 1, 2014 (CM/ECF No. 19), at ¶ 26.

Tonaquint an opportunity to participate in Section 3(a)(10) transactions. Clearly, the value of notice is cheapened when it comes after the transaction is executed and participation is no longer possible. Under the Purchase Agreement, Advaxis undertook an obligation to notify Tonaquint of proposed—i.e., unconsummated—Section 3(a)(10) transactions. Thus, the court need not concern itself with post-consummation constructive notice, and arguments regarding such notice are unavailing.

Having determined Advaxis failed to appropriately notify Tonaquint of the Ironridge transaction as required under § 5.2(k), the court finds Advaxis materially breached the Purchase Agreement.

### 3. Did Tonaquint (and Iliad) Waive any Material Breach to the Purchase Agreement?

After determining that the 3(a)(10) Ironridge transaction falls within the purview of the Purchase Agreement and that Advaxis breached the agreement by failing to adequately notify Tonaquint of the Ironridge transaction, the court must next determine whether Tonaquint and/or Iliad waived the contract breach.

The Utah Supreme Court defines the requirements for waiver as follows:

> A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it.

*Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993)(quoting *Phoenix Ins. Co. v. Heath*, 90 Utah 187, 61 P.2d 308, 311-12 (1936)). Further, the Utah Supreme Court holds "a fact finder should assess the totality of the circumstances to determine whether the

relinquishment is clearly intended,"[65] and that "any waiver 'must be distinctly made, although it may be express or implied.'"[66]

As there is no evidence that Tonaquint or Iliad expressly waived the material breach to the Purchase Agreement, any waiver must therefore be implied. Advaxis argues Tonaquint waived any material breach by never telling Advaxis of an alleged breach, never exercising the various remedies for material breach available to Tonaquint, and instead choosing to double-down its investment by investing the remaining $400,000 in Advaxis.[67] Similarly, Advaxis argues that after Tonaquint assigned its rights to Iliad, Iliad waived any material breach by not alleging breach during its interactions with Advaxis, including Advaxis' and Iliad's negotiation of the October 2013 Exchange and Settlement Agreement.[68]

The problem with Advaxis' argument is that neither Tonaquint nor Iliad were under an obligation to inform Advaxis about the breach. As the Utah Supreme Court stated, "'[m]ere silence is not a waiver unless there is some duty or obligation to speak.'"[69] Further, "[i]t is generally accepted that a duty to speak will not be found where the contracting parties 'deal at arm's length, and where the underlying facts are reasonably within the knowledge of both parties.'"[70] As nothing in the contract obligates Tonaquint or Iliad to speak—to notify Advaxis about its material breach—neither Tonaquint's nor Iliad's silence constitutes a waiver.

---

[65] *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 941 (Utah 1993).

[66] *Id.*, at 940 (quoting *Phoenix Ins. Co. v. Heath*, 90 Utah 187, 61 P.2d 308, 311-12 (1936)).

[67] Opposition, *supra* note 6, at 20.

[68] *Id.*, at 20-21.

[69] *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 940 (Utah 1993) (quoting *Plateau Min. Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 730 (Utah 1990)); *see also Brinton v. IHC Hospitals, Inc.*, 973 P.2d 956, 965-66 (Utah 1998).

[70] *Geisdorf v. Doughty*, 972 P.2d 67, 72 (Utah 1998) (quoting *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 93 (Utah 1988)).

The Utah Supreme Court case *Geisdorf v. Doughty* adds further support to the conclusion that Tonaquint's and Iliad's silence do not constitute waiver. In *Geisdorf*, a lessee failed to comply with its lease's renewal clause, which stated that "[w]ritten notice of intention to renew must be furnished Lessor at least four (4) months prior to expiration of the lease or any renewal hereunder . . . ."[71] The lessee failed to provide written notice of renewal within the required time period.[72] The Utah Supreme Court found that the lessor had no duty to remind lessee to provide the required written notice of lessee's intent to exercise the lease renewal option.[73] The court determined "both parties, as signatories, had copies of the Lease Agreement to which they could refer; the requirement of written notice was thus 'reasonably within the knowledge of both parties.'"[74] As such, the court concluded that the lessor's silence did not constitute waiver.[75]

Similar to the parties in *Geisdorf*, the parties in the present action had access to the Purchase Agreement. Advaxis was responsible to keep itself informed about its obligations under the Purchase agreement and to protect its own interests. Neither Tonaquint nor Iliad were obligated to draw Advaxis' attention to Advaxis' failure to provide appropriate notice under the Purchase Agreement, and no such silence can be taken as waiver of Advaxis' breach.[76]

---

[71] 972 P.2d 67, 68 (Utah 1998).

[72] *Id.*

[73] *Id.*, at 73.

[74] *Id.* (quoting *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 93 (Utah 1988)).

[75] *Id.*

[76] The Utah Supreme Court case *Brinton v. IHC Hospitals, Inc.* demonstrates that where, in contrast to the present case, there is an express provision requiring a party to take affirmative action in raising issues, then that party *does* have an obligation to speak and the failure to do so constitutes waiver. *See* 973 P.2d 956, 965-66 (Utah 1998).

The court notes that a consideration of the totality of the circumstances also supports the determination that neither Tonaquint nor Iliad waived the breach of the Purchase Agreement. First, the Purchase Agreement itself states the following regarding waivers:

> No Waiver. No forbearance, failure or delay on the part of a party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver of any provision of this Agreement shall be effective (a) only if it is made or given in writing (including an email message) and (b) only in the specific instance and for the specific purpose for which made or given.

(CM/ECF No. 22-2), at §15.9. It addition to demonstrating that silence or inaction does *not* constitute waiver of contract rights, this provision sets forth that any waiver shall only be effective "if it is made or given in writing." Advaxis has provided no evidence that such written waiver ever occurred. Thus, the Purchase Agreement's clear language supports the finding that neither Tonaquint nor Iliad waived Advaxis' breach.

Second, in September 2013, Advaxis presented Iliad with a draft Exchange and Settlement agreement that would have amended the Purchase Agreement by intentionally omitting § 5.2(k)—the Participation Right provision.[77] But such an amendment was not adopted. The Participation Right was not removed from the Purchase Agreement. And in the Exchange and Settlement Agreement entered into on October 10, 2013 by Iliad and Advaxis, Advaxis expressly affirmed that "the obligations under the Purchase Agreement, except as modified by this Agreement, are valid and binding obligations of [Advaxis]."[78] Thus, the Exchange and

---

[77] *See* Decl. of John M. Fife in Reply to Advaxis, Inc.'s Opp'n to Mot. for Partial Summ. J., (CM/ECF No. 57) at ¶ 15-16 and its Exhibit A attachment.

[78] (CM/ECF No. 41-1), at § 9.2.

Settlement Agreement, which Advaxis signed, supports the conclusion that Iliad did not waive

Advaxis' breach of § 5.2(k) of the Purchase Agreement.

Given the above analysis, the court determines that neither Tonaquint nor Iliad waived

any rights under the Purchase Agreement, and, as such, waiver is unavailable to Advaxis to

excuse its material breach.

## II. CONCLUSION

Having determined (i) Advaxis' Section 3(a)(10) transaction with Ironridge falls within

the purview of the Purchase Agreement, (ii) Advaxis failed to adequately notify Tonaquint of the

Ironridge transaction, and (iii) neither Tonaquint nor Iliad waived their rights under the Purchase

Agreement, the court finds Advaxis breached the Purchase Agreement and that Iliad's Motion

for Partial Summary Judgment should be GRANTED. Defendant's related motion is therefore

DENIED.

DATED this ⁷ᵗʰ day of May, 2015.

Bruce S. Jenkins
United States Senior District Judge

24